## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE GRAND JURY SUBPOENA ) | CASE NO. ■■ |
| G.■■■■ ) | |
| ) | UNDER SEAL |
| ) | |
| ) | GRAND JURY ■■ |

## GOVERNMENT'S OPPOSITION TO FORMER VICE PRESIDENT PENCE'S MOTION TO QUASH SUBPOENA ■■■■■

■■■■ former Vice President Mike Pence moves to quash a subpoena issued by a grand jury investigating whether crimes were committed in connection with efforts to reverse the results of the 2020 presidential election ■■■■■■

■■■■■■. Although Pence has discussed the events surrounding the 2020 election at length in his recent memoir, *So Help Me God*, he has refused to answer questions about those events before Congress or the grand jury. When Congress attempted to question Pence, he sought protection in the Executive Branch, claiming that "Congress has no right to [his] testimony" because "we have a separation of powers under the Constitution of the United States" and he "believe[d] it would establish a terrible precedent for the Congress to summon a vice president of the United States to speak about deliberations that took place at the White House."[1] Now that the Executive Branch seeks evidence from Pence through the grand jury, he seeks protection in the Legislative Branch, claiming that he can invoke a privilege under the Speech or Debate Clause, U.S. Const. art. I, § 6, cl. 1, which provides that "for any Speech or Debate in either House," members of Congress "shall not be questioned in any other Place," *i.e.*,

---

[1] *See* Sareen Habeshian, *Jan. 6 panel slams Pence for saying he won't testify in Capitol riot probe*, www.axios.com (Nov. 16, 2022), *available at* https://www.axios.com/2022/11/17/jan-6-committee-pence-testimony (last visited Mar. 10, 2023).

outside of Congress. Pence should not be able to have it both ways and avoid any questioning whatsoever about the events surrounding January 6. Regardless, even aside from the inconsistencies in Pence's positions, his attempt to avoid questioning before the grand jury on Speech or Debate grounds fails on its own terms. The Court should deny Pence's motion to quash ████████████████████████████████████ .

## BACKGROUND

### I.   The Grand Jury Investigation and Its Subpoena to Pence

As described in ██████████████████████████████████

████ , a federal grand jury has been convened in the District of Columbia to investigate potential violations of federal law arising from efforts to reverse the results of the 2020 presidential election. *See generally* ████████████████████████████████████

████████████████████████████████████

████ To that end, the grand jury issued a subpoena to Pence, requiring him to testify before the grand jury ████████████ . ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████

██████████████████████

████████████████████████████████████

██████████████████████████████

████████████████████████████████████





## II.    The Former Vice President's Memoir

On November 15, 2022, Pence published a memoir, *So Help Me God,* that discusses at length the pressure campaign by the former President and his associates to convince Pence to obstruct the certification of Joseph R. Biden Jr. as the winner of the 2020 election at the Joint

Session of Congress on January 6, 2021. The following is a summary of Pence's description of events.[2]

The former President "mentioned challenging the election results in the House of Representatives for the first time" to Pence on December 5, 2020. *Id.* at 433. At Pence's request, his counsel Greg Jacob prepared and provided a memorandum describing the Twelfth Amendment and the Electoral Count Act. *Id.* at 433-34. Pence believed that "[w]hatever ambiguities there were in the Electoral Count Act about the role of Congress, there was no ambiguity in the Constitution or the law about the role of the vice president," and he "never believed that the vice president's role was anything more than ceremonial." *Id.* at 434.

Around mid-December, "[t]he idea that [Pence] could influence the outcome of the election began to spread across the internet," and "[t]he president took note but wasn't consumed with the possibility at first." *Id.* at 435. During a phone call on December 13, the former President told Pence he agreed with supporters who argued Pence should decline to participate in the Joint Session altogether, suggesting, "If you want to be popular, don't do it." *Id.*

On December 19, the former President mentioned to Pence, for the first time, plans about a rally on January 6. *Id.* at 437. The President told Pence that "he thought it would be a 'big day' and it would be good to have lots of our supporters in town." *Id.*

At their weekly lunch meeting at the White House on December 21, Pence "sensed that [the former President] was growing increasingly frustrated with the lack of progress on any of the legal challenges to the election," and the former President "seemed sullen but not angry." *Id.* Pence tried to steer the former President "away from the outside lawyers who had taken over the

---

[2] All citations from *So Help Me God* are found in **Exhibit S**.

- 4 -

election challenges in November" by imploring him to "trust the White House counsel's team, led capably by Pat Cipollone." *Id.* at 437-38.

Also on December 21, Pence went to the Oval Office after the former President met with members of Congress who intended to raise objections at the Joint Session on January 6. *Id.* at 438. The former President asked Pence, "What do you think we should do?" *Id.* at 438-49. Pence responded that the former President should "take a bow" and do a "thank-you tour" and "after that, if you want to run again, run again." *Id.* at 439.

While Pence was traveling to Colorado for Christmas on December 23, the former President sent out a tweet to his followers that "was a harbinger of things to come." *Id.* at 439. Specifically, the former President retweeted "an obscure internet message without comment titled 'Operation Pence Card.'" *Id.* at 439-40. The tweet "alluded to the theory that if all else failed in election challenges in states across the country, there was still the 'Pence Card,'" which meant that Pence "could somehow alter the outcome of the election in [his] role as presiding officer over the counting of Electoral College votes submitted by the states on January 6." *Id.* at 440.

Pence called the former President to wish him Merry Christmas on December 25. *Id.* at 441. The conversation "turned to the process on January 6," and the former President told Pence, "You play a big role." *Id.* Pence responded that he did not "have the authority to change the outcome," but it was "clear from [their] conversation" that the former President "had been hearing something different." *Id.* Pence had determined that "[t]he vice president as president of the Senate is afforded no authority to reject or return votes to the states, and no vice president in history has ever asserted that authority." *Id.* at 442. At the end of the call, the former President said, "If we prove we won a state and Pelosi certifies anyway . . . I don't think we can let that happen," and he told Pence, "You'll figure it out." *Id.*

Pence "always knew that [he] did not possess the authority to overturn the election" and that his "duty was clear." *Id.* at 442. He spoke with family and friends, including former Vice President Dan Quayle, and "everyone [he] spoke with affirmed [his] view that the vice president's role was ceremonial only." *Id.* at 442-43.

When Texas Congressman Louie Gohmert and other Republicans, including would-be Trump electors from Arizona, filed a federal lawsuit on December 28, asking the U.S. District Court for the Eastern District of Texas to declare that Pence had exclusive authority and sole discretion to decide which electoral votes should be counted at the Joint Session, Pence directed his staff to request that Department of Justice lawyers represent him in that suit. *Id.* at 443. Pence felt that "such a frivolous lawsuit only served to raise unrealistic expectations that [he] could change the outcome of the election on January 6." *Id.* at 444.[3]

When Pence went to bed on New Year's Eve, he "sensed that the president's attitude toward [him] and [his] role was changing," and "[i]t didn't take too long for [Pence] to realize that [he] was right." *Id.* at 446. The former President called him on New Year's Day and "came on strong," wanting to "know why we had filed a brief opposing the Gohmert lawsuit." *Id.* The former President told Pence, "You are being savaged," and he asked, "If it gives you the power, why would you oppose it?" *Id.* Pence told the former President, as he had "many times before," that he "did not believe [he] possessed the power under the Constitution to decide which votes to accept or reject," but the former President "just kept coming." *Id.* The former President said that Pence was "too honest" and that "hundreds of thousands are gonna hate your guts" and "people

---

[3] In *Gohmert v. Pence*, 510 F. Supp. 3d 435, 443 (E.D. Tex. 2021), the district court concluded on January 1, 2021, that the plaintiffs lacked standing to challenge the results of the November 2020 presidential election and thus dismissed the case. A day later, the Fifth Circuit affirmed. *See Gohmert v. Pence*, 832 F. App'x 349, 350 (5th Cir. 2021) (per curiam) (unpublished).

are gonna think you're stupid." *Id.* The former President "railed about 'massive fraud'" and asked Pence, "You're okay with that?" Pence responded, "No," but explained that in his view, under the Constitution and the Electoral Count Act, election disputes are resolved "by the elected representatives of the people, not by one person." *Id.* at 446-47. The former President's tone softened at the end of the conversation, but Pence "knew that that would not be the end of it." *Id.* at 447.

Pence received a call from the former President on January 2, after the former President had learned that Senator Ted Cruz was working on a motion to delay the electoral vote count for ten days. *Id.* The former President told Pence he could "'make the decision' to delay the count for ten days," and the former President referred Pence, "for the first time, to an attorney named John Eastman." *Id.* The former President "asked if [Pence] would meet with [Eastman], and [Pence] said [he] would have Greg Jacob, [his] general counsel, do so." *Id.*

That evening, Pence put out a statement "supporting the right of members to bring objections under the Electoral Count Act," and when the former President called the next day (January 3), "his mood had brightened." *Id.* at 448. The former President was very pleased about the statement and said, "You have gone from very unpopular to popular!" *Id.* The former President "immediately returned to his argument of a few days before, saying, "You have the absolute right to reject electoral votes[.]" *Id.* Trump told Pence, "You can be a historic figure," and then his tone grew more confrontational and he said, "but if you wimp out, you're just another somebody." *Id.* Pence responded that he would "do the right thing." *Id.* at 448-49.

Pence met with the parliamentarian of the Senate, Elizabeth MacDonough, later that day (January 3) to discuss the procedures for the Joint Session on January 6. *Id.* at 449. MacDonough confirmed that there were no alternate electors from any state. *Id.* When Pence "mentioned that

[he] had heard that some alternate electors had been sent from several of the disputed states," MacDonough responded that "Congress always receives miscellaneous slates of electors every four years but that there was no alternate slate bearing what was known as a certificate of election from any competing state authority from any of the disputed states." *Id.* Pence thus knew "that there were no alternate electors from any state in the 2020 election." *Id.* at 449-50.

On January 4, Pence's chief of staff, Marc Short, received a call from White House chief of staff Mark Meadows that Pence "needed to be at the White House for a meeting in the Oval Office with a long list of attendees, including Rudy Giuliani, John Eastman, and everyone else working on the increasingly desperate legal strategy for January 6." *Id.* at 450. Short "pushed back on the idea that [they] would air out [their] differences in front of a room full of staff and lawyers," and when they arrived in the Oval Office, only the former President and Eastman were present. *Id.* Eastman "made his pitch," arguing that Pence "should modify the proceedings . . . by saving the five disputed states until the end" and that Pence "had the authority to simply direct that electoral certificates not be counted and instead order that they be returned to the states until each state legislature certified which of the competing slate of electors for the state was correct." *Id.* at 450. Pence "let [Eastman] drone on" and then asked him, "Do you think I have the authority to reject or return votes?" *Id.* at 451. When Eastman vacillated in response, Pence said to the former President, "Even your lawyer doesn't think I have the authority to return electoral votes." The former President nodded and "replied, 'I like the other thing better,' presumably referring to his previous opinion that [Pence] could simply choose to reject electoral votes altogether." *Id.* The former President left to attend a rally and asked if Pence's staff would "just meet with Eastman and hear him out." *Id.* Pence agreed but reiterated that he "did not possess the authority Eastman said [he] had." *Id.* Later at the rally, the former President told the crowd, "I hope that our great

- 8 -

vice president comes through for us" but "[o]f course, if he doesn't come through, I won't like him so much." *Id.*

Pence's staff, Jacob and Short, spoke with Eastman the next day (January 5) as promised. *Id.* at 452. Eastman first urged Pence to "return[] elector votes to state legislatures" but later "request[ed] that [Pence] simply reject the electors." *Id.* In the meantime, Pence received an "urgent call" that the former President wanted to see him in the Oval Office. *Id.* Pence "had told the president many times that the vice president, as president of the Senate, is afforded no authority to reject or return votes to the states and no vice president in history had ever asserted that authority," yet that afternoon, the former President "tweeted, 'The Vice President has the power to reject fraudulently chosen electors' to millions of his followers." *Id.* at 453. And when Pence arrived at the Oval Office, and spoke one-on-one with the former President, the former President said, "I think you have the power to decertify[.]" *Id.* When Pence countered that assertion, the former President "referred to the crowd outside" and told Pence, "Those people love us," suggesting that Pence "could not let them down." *Id.* When Pence stood his ground, the former President's "mood darkened" and he said, "[t]hese people cheated, and you want to play by Marquess of Queensberry rules." *Id.* at 453-54. The former President said that Pence was naive and suggested he lacked courage. *Id.* at 454. Pence maintained his position, and the former President "relented and said with more than a little sadness, 'Well, I'm gonna have to say you did a great disservice.'" *Id.* Pence told the former President to "say what you need to say" and left. *Id.*

The former President called Pence twice more that day. *Id.* He first called with Eastman, allowing Eastman to "continu[e] to make his case to [Pence] and [his] senior staff." *Id.* at 454-55. Later, at around 9:30 p.m. that evening, after Pence received delivery of a letter from a group of

- 9 -

Pennsylvania Republican legislators "urging Congress to return the state's electoral votes," the former President called "to make sure [Pence] had seen the letter, seeming to shift back to his earlier argument about returning votes to the states." *Id.* at 455. Before he went to bed, Pence saw a statement released by the Trump campaign stating that "[t]he Vice President and I are in total agreement . . . that the Vice President has the power to act." *Id.* According to the statement, "Our Vice President has several options under the U.S. Constitution. He can decertify the results or send them back to the states for change and certification. He can also decertify the illegal and corrupt results and send them to the House of Representatives for the one vote for one state tabulation." *Id.* Pence "couldn't believe" that the "campaign had issued a statement directly contradicting what [he] had told the president just a few hours earlier." *Id.*

On January 6, the former President called Pence around 11 a.m. *Id.* at 459. In a contentious phone call, Pence reiterated that he did not have the power to decide which electoral votes to count and informed the former President that he would be "issuing a statement to Congress confirming that before the joint session started." *Id.* at 459-60. The former President "laid into" Pence, telling Pence, among other things, that he would "go down as a wimp." *Id.* at 460. Thereafter, the former President attended a rally at the Ellipse.

In a letter submitted to Congress on January 6 near the beginning of the Joint Session at 1 p.m., *id.* at 518-21, Pence described his power as President of the Senate as "ministerial" because the Vice President is "not invested with any authority for making any investigation outside of the Joint Meeting of the two Houses." *Id.* at 519 (attributing the quotation to Supreme Court Justice Joseph Bradley in 1876). While further describing his role as "largely ceremonial," Pence suggested that Congress's role was "much different" because members could "raise objections and present evidence." *Id.* at 520. Pence promised to perform his duty to "open the certificates of the

- 10 -

Electors of the several states," "hear objections raised by Senators and Representatives," and "count the votes of the Electoral College for President and Vice President." *Id.* at 520-21.

The attack on the Capitol ensued later that day, and Pence did not have any contact with the former President until January 11, when they spoke alone for more than 90 minutes. *Id.* at 475-77. Pence remained "angry at how [the former President's] reckless words had endangered [his] family and all those serving at the Capitol," but he "believe[d] in forgiveness." *Id.* at 474. He knew that "President Trump was wrong" and he "had no right to overturn the election." *Id.*

## III.    The Speech or Debate Clause

The Constitution provides:

> The Senators and Representatives shall receive a Compensation for their Services, to be ascertained by Law, and paid out of the Treasury of the United States. They shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; *and for any Speech or Debate in either House, they shall not be questioned in any other Place.*

U.S. Const. art. I, § 6, cl. 1 (emphasis added). The italicized text is known as the Speech or Debate Clause.

The Speech or Debate Clause derives from "the practice of the British Parliament." Joseph Story, *Commentaries on the Constitution of the United States* § 866 (1873). Beginning as early as the fourteenth century, the Speaker of the House of Commons opened Parliament with a petition (the "Speaker's Petition") to the Crown for recognition of certain privileges for members of both Houses; by 1541, the petition included the freedom of speech. Carl Wittke, *The History of English Parliamentary Privilege* 21-23 (1921). In that respect, the parliamentary privilege often "served as a bulwark of liberty and individual freedom," *id.* at 15, protecting members of Parliament imprisoned by at times whimsical sovereigns, *see id.* at 37-38 (discussing case of Lord Arundel,

"committed to the Tower by Charles I for no clearly stated reason," but released following the House of Lords' assertion of their privilege to the King). At the same time, the parliamentary privilege gave rise to the "basest oppression" when "in the hands of crafty, powerful, and designing politicians eager to perpetuate their control and to gain the utmost personal advantage." *Id.* at 15; *see id.* at 40-41 (describing seventeenth- and eighteenth-century practice of "protections," which allowed the sale of the parliamentary privilege to "servants and outsiders" with "no real connection to Parliament," with the result that "these individuals" escaped "the jurisdiction of the courts of common law, where their offences should have been tried"). The English parliamentary privilege was also "in full exercise" in American colonial legislatures, Story, *Commentaries*, § 866, where it included the Speaker's Petition and encompassed freedom of speech and from molestation, *see generally* Mary Patterson Clark, *Parliamentary Privilege in the American Colonies* 61-92 (1943).

The principal rationale animating the English parliamentary privilege was to protect Parliament's independence. *See* Wittke, *English Parliamentary Privilege* 187 (observing that the privilege conferred on members of the houses of Parliament "special protection from arrest, interference, and molestation"). In 1689, Parliament enacted such a protection in the English Bill of Rights, using language that would later serve as a model for the Speech or Debate Clause: "Freedom of Speech, and Debates or Proceedings in Parliament, ought not to be impeached or questioned in any Court or Place out of Parliament." An Act Declaring the Rights and Liberties of the Subject and Settling the Succession of the Crown (1689); *see Rangel v. Boehner*, 785 F.3d 19, 22 (D.C. Cir. 2015). As codified in the English Bill of Rights, therefore, the privilege immunized members for "things done in the course of parliamentary proceedings" but did not "cover things done beyond the place and limits of duty." Story, *Commentaries* § 866; *see Coffin v. Coffin*, 4 Mass. 1, 16 (1808) (noting that Thomas Jefferson published a *Manual of Parliamentary*

*Practice for the Use of the Senate of the United States* in which he reasoned that the privilege embodied in the Speech or Debate Clause was "restrained to things done in the house in a parliamentary course"). It followed that Parliament itself, and not the Crown, policed its own members, thus ensuring parliamentary independence. *See United States v. Gillock*, 445 U.S. 360, 368-69 (1980) (noting that the English parliamentary privilege arose from "England's experience with monarchs exerting pressure on members of Parliament" in order "to make them more responsive to their wishes").

Transplanted into the American constitutional system, the Speech or Debate Clause serves a similar function by protecting "the independence and integrity of the legislature" and "reinforcing the separation of powers so deliberately established by the Founders." *United States v. Johnson*, 383 U.S. 169, 178 (1966); *see Gillock*, 445 U.S. at 369 (describing the "[t]wo interrelated rationales" behind the Clause as "the need to avoid intrusion by the Executive or Judiciary into the affairs of a coequal branch" and "the desire to protect legislative independence"). Like the English parliamentary privilege, the Speech or Debate Clause thus enables legislators to be free "in the discharge of their functions" from "coercion of the co-ordinate branches, Judiciary and Executive." *United States v. Rose*, 28 F.3d 181, 187 (D.C. Cir. 1994) (quoting 8 *Works of Thomas Jefferson* 322-23 (1797), *reprinted in* Philip B. Kurland & Ralph Lerner, 2 *The Founder's Constitution* 336 (1987)). At the same time, courts have recognized for over 200 years that a representative "not acting as a member of the house" is "not entitled to any privileges above his fellow-citizens" but instead "is placed on the same ground, on which his constituents stand." *Coffin*, 4 Mass. at 28-29. The Speech or Debate Clause does not "make Members of Congress super-citizens, immune from criminal responsibility." *United States v. Brewster*, 408 U.S. 501, 516 (1972).

- 13 -

Where it applies, the Speech or Debate Clause affords members of Congress "three distinct protections." *Howard v. Off. of Chief Admin. Officer of U.S. House of Representatives*, 720 F.3d 939, 946 (D.C. Cir. 2013). First, it grants members civil and criminal immunity for their legislative acts. *Doe v. McMillan*, 412 U.S. 306, 311-12 (1973); *Johnson*, 383 U.S. at 184-85. Second, it creates an evidentiary privilege that bars the use of legislative-act evidence against a member. *United States v. Helstoski*, 442 U.S. 477, 487 (1979). Third, and most relevant here, it creates a testimonial privilege guaranteeing that members "may not be made to answer" questions about their legislative acts. *Gravel v. United States*, 408 U.S. 606, 616 (1972).

## ARGUMENT

Pence contends that he is obligated to assert a privilege under the Speech or Debate Clause, which in his view encompasses the Vice President, and that he is thus forbidden from complying with a grand jury subpoena seeking                                testimony. That contention is flawed in several respects. Even if Pence's Speech-or-Debate claim were meritorious, no authority compels him to assert this testimonial privilege, any more than he was compelled to write a book about the events, and his position on the Speech-or-Debate privilege runs contrary to his public statements suggesting it was improper for Congress to seek to question him—as an Executive Branch official—about similar matters. On the merits, the Speech or Debate Clause's text, purpose, and history suggest it was not designed to cover the Vice President. Even construing the Clause more broadly, however, should result in conferring legislative immunity only on the Vice President's speech or debate while serving as the President of the Senate and presiding over the certification of the Electoral College vote on January 6, 2021. And even under the standard that applies to members of Congress, *see Gravel v. United States*, 408 U.S. 606, 625 (1972), the grand jury subpoena in this case does not seek legislative-acts evidence. The Court should therefore deny Pence's motion to quash

## I.     Pence is Not Required to Invoke the Speech or Debate Privilege.

Pence claims that "the Constitution requires him *not*" to "answer questions relating to his legislative role in the January 6 proceedings." Mot. 3 (emphasis in original). That is plainly incorrect. Even assuming *arguendo* that the legislative privilege embodied in the Speech or Debate Clause attaches to Pence, that privilege, like other constitutional privileges, is permissive, not mandatory.[4] The Clause therefore permits, but does not require, an individual subject to its protections to refrain from testifying before a grand jury concerning covered legislative acts. In *United States v. Helstoski*, 442 U.S. 477 (1979), the member, who acknowledged that he was not obliged to "give any testimony" to the grand jury or "make any statements to any officer of the United States," nonetheless voluntarily decided to appear ten times before different grand juries, where he pledged his "full and unlimited cooperation." *Id.* at 480. That decision, which facilitated the "longstanding principle that 'the public . . . has a right to every man's evidence,'" *Branzburg v. Hayes*, 408 U.S. 665, 688 (1972), did not violate the Speech or Debate Clause or some other constitutional provision. In the same way that a person validly holding a Fifth Amendment privilege against self-incrimination may nonetheless opt to speak about his criminal conduct to an investigator, *see Rogers v. United States*, 340 U.S. 367, 373 (1951) (describing as "doubtless" that an individual may "elect[] to waive his privilege" against self-incrimination because "the privilege is for his protection and not for that of other parties") (internal quotation marks omitted), Pence too is free to "waive[]" or "repudiate[]" any "claim of privilege" that might attach under the Speech or Debate Clause, *Gravel*, 408 U.S. at 622 n.13. And his decision whether to assert or waive the

---

[4] Pence certainly understands that he is free to choose to talk about these topics, as he did extensively in his book.

- 15 -

privilege does not erode its important protections any more than it erodes the Fifth Amendment privilege against self-incrimination every time a person waives it and agrees to answer questions.

Pence's belief that the Speech or Debate Clause's legislative privilege bars him from testifying before the grand jury rings especially hollow in light of his prior claim, *see supra* at 1, that his role as an Executive Branch officer engaged in conversations at the White House should shield him from appearing before Congress.

The Vice President's status as "something of a constitutional hybrid between the executive and legislative branches," *see* Joel K. Goldstein, *The New Constitutional Vice Presidency*, 30 Wake Forest L. Rev. 505, 515 (1995), who "belongs neither to the Executive nor to the Legislative Branch," *Participation of the Vice President in the Affairs of the Executive Branch*, 1 Op. O.L.C. Supp. 214, 222 (1961), should not allow Pence to avoid questions about the same subject matter by identifying as an Executive Branch official when Congress seeks his testimony and a Legislative Branch official when the Executive Branch does so.

## II. If the Speech or Debate Clause Covers the Vice President, It Reaches Only the Vice President's Speech or Debate While Serving as President of the Senate.

The Speech or Debate Clause's text, purpose, and history suggest it was not designed to cover a Vice President. If the Clause nonetheless were construed more broadly, it encompasses at most the Vice President's speech or debate while serving as the President of the Senate. As applied here, the Speech or Debate Clause would afford protection only to Pence's conduct while presiding over the certification of the Electoral College vote on January 6, 2021.

- 16 -

## A. Text, purpose, and history suggest the Speech or Debate Clause applies to the Vice President in very narrow circumstances, if at all.

By its terms, the Speech or Debate Clause does not apply to the Vice President. The Clause specifically refers to "Senators and Representatives" and provides that "for any Speech or Debate in either House, *they* shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1 (emphasis added). Although the Vice President is the "President of the Senate," U.S. Const. art. I, § 3, cl. 4, it is clear that the Vice President is not a Senator or Representative, *see* U.S. Const. art. I, § 6, cl. 2 (providing that "no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office"). Nor does the Vice President's narrow role in congressional proceedings in a limited number of instances make him the functional equivalent of a Senator or Representative. The Vice President is not permitted to vote in the Senate unless the votes are "equally divided," U.S. Const. art. I, § 3, cl. 4, or to address the Senate unless he receives permission from the Senators, *see The President of the Senate's Role in the Legislative Process,* United States Senate, https://www.senate.gov/general/Features/Part_1_VP.htm (last visited Mar. 10, 2023). The Vice President may not introduce legislation or amendments, sit on congressional committees, or wield congressional powers of investigation. In short, the Vice President "presides over the Senate only on ceremonial occasions or when a tie-breaking vote is needed." *United States v. Williams*, No. 21-cr-618, 2022 WL 2237301, at *20 (D.D.C. June 22, 2022) (internal quotation marks omitted).[5]

Pence argues (Mot. 5-6) that because the Supreme Court has extended the Speech or Debate Clause to cover legislative aides who carry out legislative work, *see Gravel*, 408 U.S. at 621, it

---

[5] The Vice President is not the only non-member to whom the Constitution assigns a role to oversee congressional proceedings. It assigns to the Chief Justice of the United States the responsibility of "presid[ing]" over the Senate during an impeachment trial of the President. U.S. Const. art. I, § 3, cl. 6.

necessarily covers the Vice President, who also carries out such work. But the textual and logical rationales for applying the Clause to legislative aides do not apply to the Vice President. The Speech-or-Debate protection afforded to a legislative aide is *derivative of* the privilege held by the Senator or Representative because "a Member and his aide are to be treated as one." *Id.* at 616 (internal quotation marks omitted). The privilege extends to "things done by [the aide] as the Senator's agent or assistant" that would have been privileged "if performed by the Senator personally" because "the day-to-day work of such aides is so critical to the Members' performance that they must be treated as the latter's alter egos." *Id.* at 616-17 (internal quotation marks omitted). The "privilege applicable to the aide" is thus "the privilege of the Senator"—consistent with the text of the Clause—and can be invoked "only by the Senator or by the aide on the Senator's behalf." *Id.* at 621-22. And, crucially, if an aide claims the privilege on the Senator's behalf, the Senator can "repudiate[] and thus waive[]" the privilege. *Id.* at 622 n.13. In contrast, when acting as President of the Senate, the Vice President does not act as an agent or assistant of a sitting Senator and therefore cannot claim the protections of the privilege belonging to a Senator as her alter ego.

In addition to the Speech or Debate Clause's textual limitation to "Senators and Representatives," applying the Clause to the Vice President would not further its interrelated purposes of preserving the "independence and integrity of the Legislative Branch," *McSurely v. McClellan*, 553 F.2d 1277, 1284 (D.C. Cir. 1976) (en banc), and "reinforcing the separation of powers," *United States v. Johnson*, 383 U.S. 169, 178 (1966). Although Pence agrees (Mot. 6) that these purposes undergird the Speech or Debate Clause, he does not explain how its application to a Vice President effectuates those ends. The Clause's core protection fosters legislative independence by preventing legislators from being questioned "in any other Place," U.S. Const.

art. I, § 6, cl. 1, but not by enabling them to escape such questioning in Congress, which may result in investigation, punishment, or expulsion, *see* U.S. Const. art. I, § 5, cl. 2 ("Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behaviour, and, with the Concurrence of two thirds, expel a Member.")—a process that the Clause also insulates from judicial review, *see Rangel v. Boehner*, 785 F.3d 19, 23-24 (D.C. Cir. 2015). But short of impeachment,[6] these mechanisms are unavailable for a Vice President, whom Congress cannot punish or otherwise check within the scope of Article I, as Pence's outright rejection of Congress's efforts to interview him about January 6 illustrates. Similarly, the Clause's separation-of-powers rationale, which aims at assuring legislators "wide freedom of speech, debate, and deliberation without intimidation or threats from the Executive Branch," *Gravel*, 408 U.S. at 616, ill fits the Vice President, a member of the Executive Branch, whose legislative role is limited generally to tie-breaking votes and presiding over ceremonial matters.

For similar reasons, the Speech or Debate Clause's historical origins do not support extending the Clause's protections to the Vice President. *See United States v. Brewster*, 408 U.S. 501, 516 (1972) (the protections of the Speech or Debate Clause do not extend "beyond its intended scope, its literal language, and *its history*") (emphasis added). As described above, the Clause is the fruit of efforts by Parliament to ensure freedom of speech without intrusion by a hostile monarch. *See supra* at 11-13. Although the Vice President's hybrid position involves legislative responsibilities, the Vice President does not shed his Executive Branch status upon setting foot on the Senate floor, and there is no sound reason to protect the Vice President from a Branch of which he is a part. Moreover, the historical emphasis on freedom of speech has no meaningful application

---

[6] The Constitution empowers Congress to remove the Vice President "on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors." U.S. Const. art. II, § 4.

- 19 -

to a Vice President whose limited ambit principally comprises ceremonial roles without a speaking part unless otherwise authorized by the Senators.

Construing the Speech or Debate Clause to exclude the Vice President would not leave his acts as President of the Senate unprotected by any governmental privileges or immunities. The Supreme Court has recognized, for example, that state and local legislators "enjoy common-law immunity from liability for their legislative acts." *Supreme Ct. of Virginia v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 732 (1980); *see Bogan v. Scott-Harris*, 523 U.S. 44, 48-49 (1998). Similar principles would apply to the Vice President when he takes legislative actions, such as casting a tiebreaking vote. *Cf. Bogan*, 523 U.S. at 55 ("[O]fficials outside the legislative branch are entitled to legislative immunity when they perform legislative functions."). The common law also affords legislators a testimonial privilege protecting against inquiries about their legislative acts. *See Village of Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 268 (1977). Again, similar principles may well apply to the Vice President. Critically, however, that evidentiary privilege is qualified, not absolute. The Supreme Court has made clear that—like executive privilege—the qualified privilege is overcome where, as here, testimony is needed in connection with "the enforcement of federal criminal statutes." *United States v. Gillock*, 445 U.S. 360, 373 (1980) (citing *United States v. Nixon*, 418 U.S. 683 (1974)). Accordingly, principles of common-law legislative privilege would not provide any basis for quashing a grand jury subpoena like the one at issue here.

**B. The Speech or Debate Clause at most covers the Vice President's core speech or debate while serving as President of the Senate, which here would encompass only Pence's conduct within Congress while presiding over the certification of the Electoral College vote.**

Although the Supreme Court has never applied the Speech or Debate Clause to the Vice President, it has "has given the Clause a practical rather than a strictly literal reading which would

- 20 -

limit the protection to utterances made within the four walls of either Chamber." *Hutchinson v. Proxmire*, 443 U.S. 111, 124 (1979). But it has gone "beyond a strictly literal reading" of the Clause only if doing so serves the Clause's fundamental purposes. *Id.* at 125; *Gravel*, 408 U.S. at 618 ("Rather than giving the clause a cramped construction, the Court has sought to implement its *fundamental* purpose of freeing the legislator from executive and judicial oversight that *realistically* threatens to control his conduct as a legislator.") (emphases added). Thus, any extension of the Speech or Debate Clause beyond its express terms to reach the Vice President as President of the Senate should extend no further than the core conduct covered by the Clause: speech or debate in either House. *See Gravel*, 408 at 625. That approach would reconcile the Supreme Court's broader construction of the Speech or Debate Clause with the narrower legislative responsibilities shouldered by the Vice President.

To the extent the Speech or Debate Clause should afford legislative immunity to the Vice President, it should do so in proportion to the limited legislative role that the Vice President plays. For example, the Speech or Debate Clause could apply when "the Vice President is fulfilling his duties under Article I to preside over the Senate and break ties." *Common Cause v. Biden*, 748 F.3d 1280, 1284 n.4 (D.C. Cir. 2014) (quoting Roy E. Brownell II, *Vice Presidential Secrecy: A Study in Comparative Constitutional Privilege and Historical Development*, 84 St. John's L. Rev. 423, 579 (2010)); *see also* Memorandum from Robert G. Dixon Jr., Ass't Att'y Gen., Office of Legal Counsel, U.S. Dep't of Justice, Re: Amenability of the President, Vice President and Other Civil Officers to Federal Criminal Prosecution While in Office, at 36 (Sept. 24, 1973) ("Dixon Memo") ("With respect to his responsibility as tie breaker [the Vice President's] immunity from criminal prosecution should be analogized to that of Members of Congress under [the Speech or Debate Clause]."). The Speech or Debate Clause might similarly apply to statements the Vice

President makes or other actions he undertakes when presiding over a congressional proceeding as President of the Senate.

Under that framework, former Vice President Pence would properly claim legislative immunity for any speech or debate "within the four walls of either Chamber," *Hutchinson*, 443 U.S. at 124, in which he engaged while presiding over the certification of the Electoral College vote on January 6, 2021. Under the Constitution and Electoral Count Act of 1887, 3 U.S.C. § 1 *et seq.*, the Vice President presides over the opening and counting of electoral certificates transmitted from state electors. *See* U.S. Const. amend. XII; 3 U.S.C. § 15. Consistent with the Vice President's typically (and admittedly, *see So Help Me God*, at 434) ceremonial role while serving as President of the Senate, Pence's responsibilities on January 6 as laid out in the Electoral Count Act were ministerial: he opened the electoral certificates "in the alphabetical order of the States"; called for objections, which had to be in writing and signed by at least one member from each House; oversaw the counting of the certificates along with four tellers; and "announce[d] the state of the vote, which announcement shall be deemed a sufficient declaration of the persons, if any, elected President and Vice President of the United States." 3 U.S.C. § 15; *see So Help Me God*, at 519 (Pence describing his role with respect to the Joint Session as "ministerial"). The Speech or Debate Clause could thus plausibly be construed, as Pence argues (Mot. 9), to confer legislative immunity to Pence for his conduct while presiding over the certification of the Electoral College vote on January 6.[7]

_____

[7] Pence cites (Mot. 5-8, 10) the Government's motion to dismiss the complaint in *Brunson v. Adams*, No. 21-cv-111, 2022 WL 316718 (D. Utah Jan. 6, 2022), *report and recommendation adopted*, 2022 WL 306499 (D. Utah Feb. 2, 2022), *aff'd*, No. 22-4007, 2022 WL 5238706 (10th Cir. Oct. 6, 2022), *cert. denied*, 143 S. Ct. 569 (2023), *reh'g denied*, No. 22-380, 2023 WL 2124291 (U.S. Feb. 21, 2023), a civil case in which the plaintiff sued Pence and every member of Congress present at the Joint Session on January 6, seeking, among other things, $2.9 billion, the

## III.   Even Under a Broader Interpretation of the Speech or Debate Clause, ▮▮▮▮▮▮▮

Even if the Court were to conclude that former Vice President Pence was protected by the

Speech or Debate Clause when he acted as President of the Senate, it should still deny his motion

to quash and require him to appear before the grand jury. The Clause protects only legislative acts,

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

### A.   The Speech or Debate Clause applies only to legislative-acts evidence.

Although, consistent with its text, "[t]he heart of the Clause is speech or debate in either

House," *Gravel*, 408 U.S. at 625, the Supreme Court has extended the Clause's protection beyond

its literal terms to include acts "generally done in a session of the House by one of its members in

relation to the business before it," such as voting, issuing committee reports, and participating in

committee hearings, *id.* at 624 (internal quotation marks omitted). "The gloss going beyond a

strictly literal reading of the Clause has not, however, departed from the objective of protecting

immediate removal of all sued defendants from office, and the immediate inauguration of former
President Trump as president. *Id.* at *2. The Government's motion to dismiss argued that the
Speech or Debate Clause afforded "absolute legislative immunity" to "members of Congress and
former Vice President Pence" for their conduct "accepting the electoral college votes during one
of the most important functions of Congress, mandated by the Twelfth Amendment." Gov't Mot.
to Dismiss for Lack of Jurisdiction and Failure to State a Claim for Relief, *Brunson v. Adams*, No.
21-cv-111, ECF No. 3 (D. Utah Aug. 5, 2021). The Government has likewise stated or suggested
that the Vice President enjoys Speech-or-Debate-Clause protection in other briefs defending the
Vice President from civil suit in connection with his legislative roles. *See* Def.'s Response to
Pltf.'s Emergency Mot. for Expedited Declaratory Judgment and Emergency Injunctive Relief at
4 n.1, *Gohmert v. Pence*, No. 6:20-cv-660, ECF No. 18 (E.D. Tex. Dec. 31, 2020); Mem. In
Support of Executive and Senate Defs.' Mot. to Dismiss the Am. Compl. at 10-12 & n.11,
*Castañon v. United States*, 1:18-cv-2545, ECF No. 21-1 (D.D.C. Apr. 1, 2019). Those briefs did
not analyze the text, purpose, and history of the Speech or Debate Clause, and their statements
regarding the Clause's applicability do not reflect the best view of the law, as explained above.
Nor were such assertions necessary, as the Government's invocations of the Vice President's
immunity from civil suit fully accord with the common-law legislative immunity he enjoys when
performing legislative duties. *See supra* at 20. Nonetheless, even assuming the Vice President is
covered under the Speech or Debate Clause, the position in those filings is consistent with the
approach to the Clause's application advocated here.

- 23 -

*only legislative activities.*" *Hutchinson*, 443 U.S. at 125 (emphasis added). The Clause thus reaches only acts that are "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel*, 408 U.S. at 625. The protections of the Speech or Debate Clause, however, do not extend "beyond its intended scope, its literal language, and its history, to include all things in any way related to the legislative process." *Brewster*, 408 U.S. at 516. For "there are few activities in which a legislator engages that he would be unable somehow to 'relate' to the legislative process." *Id.* In short, "[l]egislative acts are not all-encompassing." *Gravel*, 408 U.S. at 625.

The acts the Supreme Court has found to be protected legislative acts under the Speech or Debate Clause include such core legislative conduct as introducing proposed legislation, *see Helstoski*, 442 U.S. 477; introducing, voting for, and signing a budget ordinance, *see Bogan*, 523 U.S. 44; subpoenaing records for a committee hearing, *see Eastland v. United States Servicemen's Fund*, 421 U.S. 491 (1975); inserting material in the Congressional Record, *see Doe v. McMillan*, 412 U.S. 306 (1973); introducing evidence during committee hearings, *see Gravel*, 408 U.S. 606; delivering a speech on the floor of the House, *see Johnson*, 383 U.S. 169; interrogating witnesses during committee hearings, *see Tenney v. Brandhove*, 341 U.S. 367 (1951); and voting on resolutions, *see Kilbourn v. Thompson*, 103 U.S. (13 Otto) 168 (1880). On the other hand, conduct that has been found not to be legislative acts include efforts to "cajole" or "exhort" the Executive Branch, *Gravel*, 408 U.S. at 625; *see Hutchinson*, 443 U.S. at 121 n.10; promising to perform a future legislative act (such as voting for legislation), *Brewster*, 408 U.S. at 526; *see Helstoski*, 442 U.S. at 489; the private publication of a book describing legislative conduct (including verbatim

- 24 -

republication of documents introduced and made public at a committee hearing), *Gravel*, 408 U.S. at 622-24; and publication of a congressional report for dissemination to the public, *McMillan*, 412 U.S. at 313.

In addition, where the evidence sought relates to potential criminal conduct by third parties, the Speech-or-Debate testimonial privilege may be applied "less stringently." *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 419-20 (D.C. Cir. 1995). The Clause thus does not "immunize Senator or aide from testifying at trials or grand jury proceedings involving third-party crimes where the questions do not require testimony about or impugn a legislative act." *Gravel*, 408 U.S. at 622; *cf. id.* at 614-15 (observing that freedom from arrest embodied in the Speech or Debate Clause does not "confer immunity on a Member from service . . . as a witness in a criminal case").

**B.    The grand jury subpoena does not seek** ▮.

Applying those principles here, none of the information sought by the grand jury subpoena constitutes protected ▮

- 25 -

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Pence should be required

to ▮▮▮▮▮▮▮▮▮▮ answer questions regarding those topics at the very least.

Pence primarily focuses (Mot. 10-11) on his communications about and preparations for his role presiding over the certification of the Electoral College vote on January 6, 2021, but those are likewise unprotected under the Speech or Debate Clause for several reasons. *First*, Pence may not invoke legislative immunity for any "inquiry into activities that are casually or incidentally related" to the Electoral College certification proceeding. *Brewster*, 408 U.S. at 528. Relying on cases that conclude that informal fact-gathering activities fall within the scope of the Speech or Debate Clause, *see* Mot. 7 (citing *Jewish War Veterans v. Gates*, 506 F. Supp. 2d 30, 57 (D.D.C. 2017), and *Schilling v. Speaker of the House of Representatives*, 22-cv-162, 2022 WL 4745988, at *7-*8 (D.D.C. Oct. 3, 2022)), Pence appears to liken his own activities in advance of the Electoral College certification proceeding to the types of investigations or preparations at issues in those cases. As an initial matter, the expansive interpretation of the Speech or Debate Clause's scope adopted in those cases, *see, e.g.*, *Jewish War Veterans*, 506 F. Supp. 2d at 54 (finding protected under the Speech or Debate Clause any "informal information gathering in connection with or in aid of a legitimate legislative act"), is inconsistent with the D.C. Circuit's observation that "there are 'finite limits' to the shield erected by the Speech or Debate Clause," including a "requirement" that Congress, typically through a committee or subcommittee, has authorized the investigation or inquiry. *McSurely*, 553 F.2d at 1287; *but see Gov't of Virgin Islands v. Lee*, 775 F.2d 514, 525 (3d Cir. 1985) (adopting a different standard for informal fact-gathering activities).

Case 1:23-mc-00035-JEB   Document 11-2   Filed 06/09/23   Page 27 of 30

Case [REDACTED]   Filed 03/10/23   Page 27 of 92

But even if the Speech or Debate Clause protects informal congressional fact-gathering activities, Pence cannot plausibly claim protection under the Clause here. As noted above, the Speech-or-Debate privilege exists to ensure that Congress can keep private certain deliberative communications, in order "to protect the integrity of the legislative process." *Brewster*, 408 U.S. at 507. But as Pence himself repeatedly reaffirmed in his memoir, he was not involved in any "legislative process" on January 6 because his role "was ceremonial only," *So Help Me God*, at 443; *accord id.* at 434, given that he lacked the "authority to reject or return votes to the states," *id.* at 442. Stated differently, Pence's activities before presiding over the Joint Session were not analogous to the kind of activity a member might undertake in preparation to vote on a bill, participate in a hearing, *see Gravel*, 408 U.S. at 629, or draft a subcommittee report, *see MINPECO, S.A. v. Conticommodity Services*, 844 F.2d 856, 861-62 (D.C. Cir. 1988). Even if a Vice President's preparatory acts might arguably fall within the ambit of the Speech or Debate Clause in some contexts—such as if a Vice President, in the role of President of the Senate, takes steps to prepare for casting a tie-breaking vote[8]—Pence cannot credibly claim that any of his conduct prior to the January 6 Joint Session qualified as this type of activity. *See* Dixon Memo, at 36. Preparations to perform the ministerial and ceremonial task of presiding over a congressional proceeding do not constitute legislative acts.

*Second*, any [REDACTED]

[REDACTED] . *Gravel*, 408

U.S. at 625. According to the account that Pence provides in his memoir, *see supra* at 4-10, communications about Pence's role in the Electoral College vote certification consisted largely of

---

[8] At the same time, the "*mere possibility* that the Vice President may have to cast a tie-breaking vote would . . . not justify his immunity from criminal proceedings." Dixon Memo, at 36 (emphasis added).

efforts by individuals outside of Congress ▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

▐▐▐▐▐▐ to persuade Pence to exert powers—such as to determine unilaterally the validity of

electoral certificates or to suspend the Joint Session and transmit electoral certificates back to the

states—that Pence had concluded he did not possess as the President of the Senate. Just as a

member's efforts to "attempt to influence the Department of Justice" to dismiss a pending

indictment were "in no wise related to the due functioning of the legislative process," *Johnson*,

383 U.S. at 172, so too ▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐ permitting Pence

to shroud in secrecy conversations about his role on January 6 that took place ▐▐▐▐▐▐▐▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐ under a

claim of *legislative* privilege is an illogical application of the Speech or Debate Clause.▐

*Third*—and relatedly—any "promise to deliver a speech, to vote, or to solicit other votes

at some future date" is not a legislative act, nor is "a promise to introduce a bill." *Helstoski*, 442

U.S. at 490 (emphasis omitted). The Supreme Court has distinguished a member's earlier acts

from what follows later, such as how the member "spoke, how he debated, how he voted, or

anything he did in the chamber or in committee." *Brewster*, 408 U.S. at 526. The prior acts are

separate from "the legislative performance itself." *Id.* at 527. Applied here, any promises—

whether to act in a certain manner or not to do so—that Pence made ▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

─────────────────────

▐ ▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐
▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐

████ about his intended course of action at the Electoral College certification proceeding would not qualify as a legislative act under the Speech or Debate Clause. Nor does the Speech or Debate Clause permit Pence to avoid testifying about efforts by others to influence his vote. *See United States v. Renzi*, 651 F.3d 1012, 1022-27 (9th Cir. 2011) (the Clause permits inquiry into "negotiations" between a member and private individuals in which the member sought to extort the individuals in exchange for a legislative act). If a promise to deliver a speech, give a vote, or introduce a bill is not legislative activity, it necessarily follows that neither are efforts to induce a member of Congress to engage in such activities. And if a member's promise to engage in some sort of act at a future proceeding before Congress is not covered by the Speech or Debate Clause, then certainly the *refusal* to engage in future conduct before Congress is not protected legislative activity. Thus, even assuming that Pence's activities on the floor of Congress on January 6 were protected legislative acts under the Speech or Debate Clause, prior efforts by others to influence Pence's conduct at the Joint Session were not.

*Fourth*, even if Pence's "preparations" in advance of January 6 were otherwise immune as legislative acts, his publication of those preparations vitiated if not obviated such immunity. *See Gravel*, 408 U.S. at 622, 625-26 (finding that Senator Gravel's publication of material that he also read into the congressional record was not protected); *cf. Brewster*, 408 U.S. at 512-13 ("speeches delivered outside the Congress" are not privileged). Here, Pence has written a book and spoken extensively in public about many of the topics at issue, *see supra* at 3-11, so there is no plausible claim that he enjoys an evidentiary privilege that would preclude questioning him on those topics, including the communications and other actions that inform the book's descriptions. Moreover, to the extent the Speech-or-Debate testimonial privilege operates to guard against the compelled disclosure of "frank or embarrassing statements" that would result in "chill[ing] the exchange of

- 29 -

views with respect to legislative activity," *United States v. Rayburn House Off. Bldg.*, 497 F.3d 654, 661 (D.C. Cir. 2007), any chilling concern dissipates where the privilege-holder voluntarily—and widely—publicizes the nature of the communications in question.

*Finally*, any testimonial privilege under the Speech or Debate Clause would operate "less stringently" here because the testimony              sought under the grand jury subpoena concern potential criminal conduct                                                    . *See Brown & Williamson Tobacco Corp.*, 62 F.3d at 419-20. For all the reasons described above, the areas of interest to the grand jury's investigation "do not require testimony about or impugn a legislative act," which in turn means that Pence is not "immunize[d] . . . from testifying" about these areas "at trials or grand jury proceedings." *Gravel*, 408 U.S. at 622.

## CONCLUSION

The Court should deny Pence's motion to quash and order Pence to comply with the subpoena, including by                              appearing before the grand jury to answer questions.

Respectfully submitted,
JACK SMITH
Special Counsel
N.Y. Bar No. 2678084

By:   /s/ *James I. Pearce*
      James I. Pearce (N.C. Bar No. 44691)
      John M. Pellettieri (N.Y. Bar No. 4145371)
      Thomas P. Windom (D.C. Bar No. 502131)

- 30 -